**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHAD GELLNER, MATTHEW RUFO, and MELVYN KLEIN, Derivatively On Behalf Of TILRAY, INC., <br><br>               Plaintiffs, <br><br>               v. <br> BRENDAN KENNEDY, MICHAEL AUERBACH, REBEKAH DOPP, MARYSCOTT GREENWOOD, CHRISTINE ST. CLARE, AND MARK CASTANEDA, <br><br>               Defendants, <br><br> TILRAY, INC., <br><br>               Nominal Defendant. | Case No.: <br><br> **VERIFIED STOCKHOLDER** <br> **DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

Plaintiff Chad Gellner, Matthew Rufo and Melvyn Klein ("Plaintiffs"), derivatively and on behalf of Tilray, Inc. ("Tilray" or the "Company"), by Plaintiffs' undersigned attorneys, for Plaintiffs complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through Plaintiffs' attorneys, which included a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tilray, Company press releases and conference call transcripts, and media reports about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**I.      NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Tilray against certain of its officers and directors seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") that occurred between November 2, 2017 through the present (the "Relevant Period") and have caused substantial harm to the Company.

2.      The Company was founded in 2013 and is headquartered in Toronto, Ontario. The Company engages in the research, cultivation, processing, and distribution of medical cannabis. The Company offers its products to patients, physicians, pharmacies, governments, and hospitals, and to researchers for commercial purposes, as well as compassionate access and clinical research applications.

3.      On January 15, 2019, the Company issued a press release announcing entry into a marketing and revenue sharing agreement with Authentic Brands Group ("ABG"), "an owner of a portfolio of global lifestyle and entertainment brands" (the "ABG Agreement").

4.      Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the purported advantages of the ABG Agreement were significantly overstated; (ii) the underperformance of the ABG Agreement would foreseeably have a significant impact on the Company's financial results; and (iii) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On March 2, 2020, Tilray issued a press release announcing the Company's financial results for the fourth quarter and full year 2019.  Among other results, the Company

reported a net loss for the year of $321.2 million, or $3.20 per share, compared to $67.7 million, or $0.82 per share, for 2018.  In addition, the Company disclosed that it "*recorded non-cash charges of $112.1 million related to impairment of the Authentic Brands Group LLC ('ABG') agreement as well as $68.6 million in inventory reserves*."

6.      On this news, the Company's stock price fell $2.33 per share, or 15.18%, to close at $13.02 per share on March 3, 2020.

## II.    **JURISDICTION AND VENUE**

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Sections 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Company is incorporated in this District, a substantial portion of the transactions and wrongs, complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## III.   **PARTIES**

### A.     **Plaintiffs**

9.      Plaintiff Chad Gellner is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

10.     Plaintiff Matthew Rufo is a current stockholder of the Company and intends to retain ownership of said shares through the prosecution of the instant matter.

11.     Plaintiff Melvyn Klein is a current stockholder of the Company and intends to retain

ownership of said shares through the prosecution of the instant matter.

### B.      Nominal Defendant

12.     Defendant Tilray is incorporated in Delaware and the Company's principal executive offices are located at 1100 Maughan Road, Nanaimo, British Columbia, Canada. Tilray's common stock trades on the NASDAQ under the ticker symbol "TLRY."

### C.      Directors

13.     *Defendant Brendan Kennedy* ("Kennedy") is the President, Chief Executive Officer ("CEO") and Director of the Company.  Defendant Kennedy has served as the Company's President and CEO and member of the Board of Directors ("Board") since January 2018 and has served as the CEO and member of the Board of the Company's subsidiary, Tilray Canada Ltd., since 2016.  In addition, *Defendant Kennedy sold 643,000 shares of Tilray common stock during the Relevant Period.*

14.     *Defendant Michael Auerbach ("Auerbach")* has served as a member of the Board since February 2018.

15.     *Defendant Rebekah Dopp* ("Dopp") has served as a member of the Board since May 2018.  Defendant Dopp is a member of the Audit Committee and Nominating and Corporate Governance Committee.  She is also the Chair of the Compensation Committee.

16.     *Defendant Maryscott Greenwood* ("Greenwood") has served as a member of the Board since May 2018.  Defendant Greenwood is a member of the Audit Committee and the Compensation Committee.  She is also the Chair of the Nominating and Corporate Governance Committee.

17.     *Defendant Christine St. Clare* ("St. Clare') has served as a member of the Board since June 2018.  Defendant St. Clare is Chair of the Audit Committee.  She is also a member of

the Compensation Committee and the Nominating and Corporate Governance Committee.

18.      Defendants Kennedy, Auerbach, Dopp, Greenwood, and St. Clare are collectively hereinafter referred to as the "Director Defendants."

19.      The Directors Defendants breached their duties to the Company by making or causing the Company to make false statements that artificially inflated the price of Tilray securities during the Relevant Period.   The Director Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Tilray's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.

**Officer Defendant**

20.      ***Defendant Mark Castaneda*** ("Castaneda") has served at all relevant times as the Chief Financial Officer ("CFO") and Treasurer of the Company.   ***Defendant Castaneda sold 80,000 shares of Tilray common stock during the Relevant Period.***

## THE AUDIT COMMITTEE CHARTER

21.      The Audit Committee Charter states in relevant part:

PURPOSE AND POLICY

The primary purpose of the Audit Committee (the "Committee") shall be to act on behalf of the Company's Board of Directors (the "Board") in fulfilling the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting and audits of financial statements, as well as the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"). The operation of the Committee shall be subject to the Bylaws of the Company as in effect from time to time and Section 141 of the Delaware General Corporation Law.

The policy of the Committee, in discharging these obligations, shall be to maintain and foster an open avenue of communication among the Committee and the

Auditors, the Company's financial management.

\*       \*       \*

## RESPONSIBILITIES

The Committee shall oversee the Company's financial reporting process on behalf of the Board, shall have direct responsibility for the appointment, compensation, retention and oversight of the work of the Auditors and any other registered public accounting firm engaged for the purpose of performing other review or attest services for the Company. The Auditors and each such other registered public accounting firm shall report directly and be accountable to the Committee. The Committee's functions and procedures should remain flexible to address changing circumstances most effectively. To implement the Committee's purpose and policy, the Committee shall be charged with the following functions and processes with the understanding, however, that the Committee may supplement or (except as otherwise required by applicable laws or rules) deviate from these activities as appropriate under the circumstances:

1.  Evaluation and Retention of Auditors. To evaluate the performance of the Auditors, to assess their qualifications (including their internal quality-control procedures and any material issues raised by that firm's most recent internal quality-control review or any investigations by regulatory authorities) and to determine whether to retain, or to terminate, the engagement of the existing Auditors, or to appoint and engage a different independent registered public accounting firm.

2.  Communication Prior to Engagement. Prior to engagement of any prospective Auditors, to review a written disclosure by the prospective Auditors of all relationships between the prospective Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence, and to discuss with the prospective Auditors the potential effects of such relationships on the independence of the prospective Auditors, consistent with Ethics and Independence Rule 3526, Communication with Audit Committees Concerning Independence ("Rule 3526"), of the Public Company Accounting Oversight Board (United States) (the "PCAOB").

3.  Approval of Audit Engagements. To determine and approve engagements of the Auditors, prior to commencement of such engagements, to perform all proposed audit, review and attest services, including the scope of and plans for the audit, the compensation to be paid, at the Company's expense, to the Auditors and the negotiation on behalf of the Company, of the Auditors' engagement letters, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of

preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

4.      Approval of Non-Audit Services. To determine and approve engagements of the Auditors, prior to commencement of such engagements (unless in compliance with exceptions available under applicable laws and rules related to immaterial aggregate amounts of services), to perform any proposed permissible non-audit services, including the scope of the service and the compensation to be paid therefor, at the Company's expense, which approval may be pursuant to preapproval policies and procedures established by the Committee consistent with applicable laws and rules, including the delegation of preapproval authority to one or more Committee members so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

5.      Audit Partner Rotation. To monitor the rotation of the partners of the Auditors on the Company's audit engagement team as required by applicable laws and rules and to consider periodically and, if deemed appropriate, adopt a policy regarding rotation of auditing firms.

6.      Auditor Independence. At least annually, consistent with Rule 3526, to receive and review written disclosures from the Auditors delineating all relationships between the Auditors, or their affiliates, and the Company, or persons in financial oversight roles at the Company, that may reasonably be thought to bear on independence and a letter from the Auditors affirming their independence, to consider and discuss with the Auditors any potential effects of any such relationships on the independence of the Auditors as well as any compensation or services that could affect the Auditors' objectivity and independence, and to assess and otherwise take appropriate action to oversee the independence of the Auditors.

7.      Former Employees of Auditors. To consider and, if deemed appropriate, adopt clear policies regarding Committee preapproval of employment by the Company of individuals employed or formerly employed by the Company's Auditors and engaged on the Company's account.

8.      Audited Financial Statement Review. To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the Securities and Exchange Commission and to recommend whether or not such financial statements should be so included.

9.      Annual Audit Results. To review with management and the Auditors, the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of the Company's accounting principles and

practices, the Auditors' views about qualitative aspects of the Company's significant accounting practices, the reasonableness of significant judgments and estimates (including material changes in estimates), all known and likely misstatements identified during the audit (other than those the Auditors believe to be trivial), the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under the standards of the PCAOB.

10.     Auditor Communications. At least annually, to discuss with the Auditors the matters required to be discussed by Auditing Standard 1301, Communications with Audit Committees, as adopted by the PCAOB (including any successor rule adopted by the PCAOB).

11.     Quarterly Results. To review with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the Securities and Exchange Commission of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the PCAOB.

12.     Management's Discussion and Analysis. To review with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the Securities and Exchange Commission.

13.     Press Releases. To review with management and the Auditors, as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to  be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

14.     Accounting Principles and Policies. To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet structures and any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements.

15.     Risk Assessment and Management. To review and discuss with

management and, as appropriate, the Auditors the Company's major financial risk exposures and the steps taken by management to monitor and control these exposures.

16.     Management Cooperation with Audit. To evaluate the cooperation received by the Auditors during their audit examination, including any significant difficulties encountered during the audit or any restrictions on the scope of their activities or access to required records, data and information and, whether or not resolved, significant disagreements with management and management's response, if any.

17.     Management Letters. To review with the Auditors and, if appropriate, management, any "management" or "internal control" letter issued or, to the extent practicable, proposed to be issued by the Auditors and management's response, if any, to such letter, as well as any additional material written communications between the Auditors and management.

18.     National Office Communications. To review with the Auditors, as appropriate, communications between the audit team and the Auditors' national office with respect to accounting or auditing issues presented by the engagement.

19.     Disagreements Between Auditors and Management. To review with management and the Auditors, or any other registered public accounting firm engaged to perform review or attest services, any conflicts or disagreements between management and the Auditors, or such other accounting firm, whether or not resolved, regarding financial reporting, accounting practices or policies or other matters, that individually or in the aggregate could be significant to the Company's financial statements or the Auditors' report, and to resolve any conflicts or disagreements regarding financial reporting.

20.     Internal Control Over Financial Reporting. To confer with management and the Auditors, as appropriate, regarding the scope, adequacy and effectiveness of internal control over financial reporting including any special audit steps taken in the event of material control deficiencies.

21.     Separate Sessions. Periodically, to meet in separate sessions with the Auditors, as appropriate, and management to discuss any matters that the Committee, the Auditors or management believe should be discussed privately with the Committee.

22.     Correspondence with Regulators. To consider and review with management, the Auditors, outside counsel, as appropriate, and any special counsel, separate accounting firm or other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or

governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

23.     Complaint Procedures. To establish procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

24.     Engagement of Registered Public Accounting Firms. To determine and approve engagements of any registered public accounting firm (in addition to the Auditors), prior to commencement of such engagements, to perform any other review or attest service, including the compensation to be paid, at the Company's expense, to such firm and the negotiation and execution, on behalf of the Company, of such firm's engagement letter, which approval may be pursuant to preapproval policies and procedures, including the delegation of preapproval authority to one or more Committee members, so long as any such preapproval decisions are presented to the full Committee at the next scheduled meeting.

25.     Ethical Compliance. To review the results of management's efforts to Monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, including review and oversight of related-party transactions as required by Nasdaq rules.

26.     Investigations. To investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

27.     Proxy Report. To prepare the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

28.     Annual Charter Review. To review and assess the adequacy of this charter annually and recommend any proposed changes to the Board for approval.

29.     Report to Board. To report to the Board of Directors with respect to material issues that arise regarding the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance or independence of the Auditors or such other matters as the Committee deems appropriate from time to time or whenever it shall be called upon to do so.

30.     Insurance Coverage. The Committee shall review and establish appropriate insurance coverage for the Company's directors and executive officers.

31.     Annual Committee Evaluation. To conduct an annual evaluation of the performance of the Committee.

32.     General Authority. To perform such other functions and to have such powers as may be necessary or appropriate in the efficient and lawful discharge of the foregoing.

It shall be the responsibility of management to prepare the Company's financial statements and periodic reports and the responsibility of the Auditors to audit those financial statements. These functions shall not be the responsibility of the Committee, nor shall it be the Committee's responsibility to ensure that the financial statements or periodic reports are complete and accurate, conform to GAAP or otherwise comply with applicable laws.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

22.     The Company engages in the research, cultivation, processing, and distribution of medical cannabis. The Company offers its products to patients, physicians, pharmacies, governments, and hospitals, and to researchers for commercial purposes, as well as compassionate access and clinical research applications.

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE RELEVANT PERIOD

23.     On January 15, 2019, Defendants caused the Company to issue a press release reporting its entry into the ABG Agreement.  The press release stated in relevant part:

NANAIMO, British Columbia -- (BUSINESS WIRE) -- Today, Tilray, Inc. (NASDAQ: TLRY), a global pioneer in cannabis production and distribution, and Authentic Brands Group (ABG), an owner of a portfolio of global lifestyle and entertainment brands, announced that they have signed a long-term revenue sharing agreement to market and distribute a portfolio of consumer cannabis products within ABG's brand portfolio in jurisdictions where regulations permit.

As the owner of more than 50 brands, ABG builds value by partnering with an expansive network of best-in-class manufacturers, operators and retailers. With a global retail footprint of over 100,000 points of sale and more than 4,500 branded freestanding stores and shop-in-shops, ABG's portfolio generates approximately US$9 billion in retail sales annually. Reaching nearly 250 million social media

followers across key digital platforms, ABG's robust marketing arm drives growth and engagement for its portfolio, including connecting its brands with over 150 million targeted followers through Winston, its proprietary micro-influencer network.

Under the terms of the agreement:

- The parties will leverage ABG's portfolio of brands to develop, market and distribute consumer cannabis products across the world, as and where legal, with an immediate focus on opportunities, including CBD, in Canada and the U.S. subject to applicable and brand appropriate regulations.

- Tilray will be the preferred supplier of active cannabinoid ingredients for such products.

- Tilray will initially pay to ABG US$100 million and up to US$250 million in cash and stock, subject to the achievement of certain commercial and/or regulatory milestones.

- Tilray will have the right to receive up to 49% of the net revenue from cannabis products bearing ABG brands, with a guaranteed minimum payment of up to US$10 million annually for 10 years, subject to certain commercial and/or regulatory milestones.

- Through this agreement, ABG and Tilray join forces at the intersection of science and brand to connect consumers with innovative health and wellness products suited to their many lifestyle needs.

"We are thrilled to partner with ABG, a global leader known for expertly managing and marketing an owned portfolio of iconic brands," said Brendan Kennedy, Tilray President and CEO. "As we work to expand Tilray's global presence, this agreement leverages our complementary strengths and will be accretive to our shareholders as we reach new consumers across the entertainment, fashion, beauty, home and health and wellness sectors. We look forward to working with ABG to bring unique and sought-after branded cannabis products to the marketplace." Daniel W. Dienst, ABG Executive Vice Chairman, said, "Tilray's unyielding focus on science, product quality, operational excellence and innovation has allowed them to quickly emerge as a leader in the cannabis industry. We see extraordinary potential for cannabis in the fast-growing health and wellness category – particularly for CBD products in the United States and around the world - and are excited about this long-term partnership."

24.     On March 18, 2019, Defendants caused the Company to issue a press release

reporting its financial results for the full year of 2018.  The press release touted the Company's

entry into the ABG Agreement, describing it as one of the Company's "Business Highlights" for

the year:

> [Tilray] [a]nnounced a long-term revenue sharing agreement with Authentic
> Brands Group ("ABG") to leverage their portfolio of brands and develop, market
> and distribute consumer cannabis products across the world. This global
> partnership will focus on CBD products in the United States and THC/CBD
> products in Canada, and elsewhere as regulations permit.

25.     On March 25, 2019, Defendants caused the Company to file an Annual Report on

Form 10-K with the SEC, reporting the Company's financial and operating results for the year

ended December 31, 2018 (the "2019 10-K").  With respect to the ABG Agreement, the 2019

Form 10-K stated:

> [Tilray] currently ha[s], and may expand the scope of, and may in the future enter
> into, strategic alliances with third parties that we believe will ***complement or
> augment our existing business***.  Examples of such strategic alliances include our
> agreement with Sandoz AG, joint venture with AB InBev and ***partnership with
> ABG***.  [Emphases added].

26.     On May 14, 2019, Defendants caused the Company to issue a press release reporting

its financial results for the first quarter of 2019.  The press release touted the Company's entry into

the ABG Agreement, describing it as one of the Company's "Business Highlights" for the quarter:

> [Tilray] [c]ompleted a long-term revenue sharing agreement with Authentic Brands
> Group (ABG) to leverage their portfolio of brands and develop, market and
> distribute consumer cannabis products across the world. The partnership  will
> initially focus on CBD products in the U.S. and THC/CBD products in Canada and
> expand globally as regulations permit.

27.     That same day, the Company hosted an earnings call with investors and analysts, in

which management again touted the strength of ABG's portfolio and the purported benefits of the

ABG Agreement, stating that "[o]ur strategic partnership with Authentic Brands Group (ABG)

announced in January will leverage ABG's portfolio of more than 50 of the world's most iconic

brands, as well as their North American distribution network."  The transcript went on to say,

"[w]ith Manitoba, *Authentic Brands Group*, and Live Well, we believe *we are well-positioned*

*for long-term leadership in the market*." (Emphases added).

28.     On May 15, 2019, Defendants caused the Company to file a Quarterly Report on

Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter

ended March 31, 2019 (the "Q1 2019 10-Q"). With respect to the ABG Agreement, the Q1 2019

10-Q stated in relevant part:

> [Tilray] currently ha[s], and may expand the scope of, and may in the future enter
> into, strategic alliances with third parties that we believe will complement or
> augment our existing business. Examples of such strategic alliances include our
> agreement with Sandoz AG, joint venture with AB InBev and *partnership with*
> *ABG*. [Emphases added].

29.     On August 13, 2019, Defendants caused the Company to file a Quarterly Report on

Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter

ended June 30, 2019 (the "Q2 2019 10-Q").  With respect to the ABG Agreement, the Q2 2019

10-Q stated:

> [Tilray] currently ha[s], and may expand or reduce the scope of, and may in the
> future enter into, strategic alliances with third parties that we believe will
> complement or augment our existing business. Examples of such strategic alliances
> include our agreement with Sandoz AG, joint venture with AB InBev and
> *partnership with ABG*.  [Emphases added].

30.     That same day, the Company hosted an earnings call with investors and analysts, in

which management again touted the strength of ABG's portfolio and highlighted the purported

progress of the Company's partnership with ABG, stating in relevant part:

> [Tilray's] *strategic partnership with Authentic Brands Group which we*
> *announced in Q1 continues to build momentum* with our first product launch
> planned for the second half of the year in the United States. The ABG partnership
> is the first of its kind deal leveraging ABG's portfolio of more than 50 of the world's
> more iconic brands for the global CBD market.

*  *  *

[Tilray's] strategy to capitalize on the estimated $22 billion hemp-derived CBD industry in the United States is centered on building a portfolio of trusted brands. With Manitoba Harvest as our foundation, we will continue to add to our portfolio whether it be via acquisitions such as Smith & Sinclair, **_partnerships such as Authentic Brands Group_**, or by building our own brands. [Emphases added].

31.     On November 12, 2019, the Company hosted an earnings call with investors and analysts, in which management lauded the ABG Agreement, calling it one of the Company's "pillars of growth" and an "important business driver," and stated that the strategic partnership will "expedite [the Company's] entry into the THC market when legally permitted to do so."

32.     On November 13, 2019, Defendants caused the Company to file a Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2019 (the "Q3 2019 10-Q"). With respect to the ABG Agreement, the Q3 2019 10-Q stated:

[Tilray] currently ha[s], and may expand or reduce the scope of, and may in the future enter into, strategic alliances with third parties that we believe will complement or augment our existing business. Examples of such strategic alliances include our agreement with Sandoz AG, joint venture with AB InBev and **_partnership with ABG_**. [Emphases added].

33.     The statements referenced above were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the purported advantages of the ABG Agreement were significantly overstated; (ii) the underperformance of the ABG Agreement would foreseeably have a significant impact on the Company's financial results; and (iii) as a result, Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## THE TRUTH EMERGES

34.     On March 2, 2020, Defendants caused the Company to issue a press release announcing the Company's financial results for the fourth quarter and full year 2019.  Among other results, the Company reported a net loss for the year of $321.2 million, or $3.20 per share, compared to $67.7 million, or $0.82 per share, for 2018.  In addition, the Company disclosed that it "recorded non-cash charges of $112.1 million related to impairment of the Authentic Brands Group LLC ('ABG') agreement as well as $68.6 million in inventory reserves."

35.     On this news, the Company's stock price fell $2.33 per share, or 15.18%, to close at $13.02 per share on March 3, 2020.

### DUTIES OF THE DIRECTOR DEFENDANTS

36.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

37.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

38.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)       ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)       conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)       properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)       remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)       ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)        ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

39.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

40.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

41.    Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

42.    Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

43.    Plaintiffs are current owners of the Company stock and have continuously been an owners of Company stock during all times relevant to the Director Defendants' wrongful course

of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

44.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

45.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

46.     The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

47.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

48.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

49.     Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Kennedy**

50.     The principal professional occupation of Defendant Kennedy is his employment with the Company as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.   Additionally, Kennedy is a named defendant in the securities class action entitled *Chad Ganovsky v. Tilray, Inc., et al.*, Case 1:20-cv-01240 (E.D.N.Y) (the "Securities Class Action").

**Defendants Dopp, Greenwood and St. Clare**

51.     Demand is excused because Defendants Dopp, Greenwood and St. Clare face a substantial likelihood of liability for their misconduct.

52.     During the Relevant Period, Defendants Dopp, Greenwood and St. Clare served as members of the Audit Committee.   Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing the Company's financial statements, press releases, and assuring the adequacy and effectiveness of disclosure controls, ensure ethical compliance, and otherwise meet their responsibilities as set forth in the Audit Committee Charter.

53.     Defendants Dopp, Greenwood and St. Clare breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. Therefore, Defendants Dopp,

Greenwood and St. Clare face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

**Defendants Kennedy, Auerbach, Dopp, Greenwood, and St. Clare**

54.     Defendants Kennedy, Auerbach, Dopp, Greenwood, and St. Clare each signed the false and misleading 2019 Form 10-K.  These Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that  (i) the purported advantages of the ABG Agreement were significantly overstated and (ii) the underperformance of the ABG Agreement would foreseeably have a significant impact on the Company's financial results.

## COUNT I

### (Against the Director Defendants for Breach of Fiduciary Duty)

55.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

56.     The Director Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

57.     The Director Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

58.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Director Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported business performance, as alleged herein.  These actions could

not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

59.     As a direct and proximate result of the Director Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

60.     As a direct and proximate result of the Director Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, and reputational harm.

## **COUNT II**

### **(Against the Director Defendants for Waste of Corporate Assets)**

61.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

62.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

63.     As a result of the misconduct described above, the Director Defendants wasted corporate assets by, inter alia: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend Defendants' unlawful actions.

64.     As a result of the waste of corporate assets, the Director Defendants are liable to the Company.

65.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT III

### (Against Defendants Kennedy And Castaneda For Unjust Enrichment)

66.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

67.     By their wrongful acts and the omissions of material fact that they caused to be made, Defendants Kennedy and Castaneda were unjustly enriched at the expense of, and to the detriment of, the Company.

68.     During the Relevant Period, Defendants Kennedy and Castaneda either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of Defendants' bad faith conduct.  Defendants Kennedy and Castaneda also sold their shares of Tilray stock at inflated prices when they were in possession of material insider information.

69.     Plaintiffs, as shareholders and representatives of the Company, seek restitution from Defendants Kennedy and Castaneda and seek an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation based compensation, obtained by Defendants Kennedy and Castaneda due to their wrongful conduct and breach of their fiduciary duties.

## COUNT IV

### (For Contribution For Violations Of Sections 10(B) And 21D Of The Exchange Act)

70.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

71.     Defendant Kennedy is a named defendant in the securities fraud class action also pending in this Court, captioned *Chad Ganovsky v. Tilray, Inc., et al.*, Case 1:20-cv-01240 (E.D.N.Y).

72.     Tilray is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for, *inter alia*, violations of Section 10(b) of the Exchange Act. If the Company is found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omission of Defendant Kennedy. Under Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), the Company is entitled to receive contribution from those Defendants in connection with the Securities Class Action against the Company.

73.     Defendants Kennedy, Auerbach, Dopp, Greenwood, and St. Clare, as directors and officers, and otherwise, had the power and/or ability to, and did, directly or indirectly, control or influence the Company's general affairs, including the content of public statements about Tilray, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Further, Defendants Kennedy, Auerbach, Dopp, Greenwood, and St. Clare are liable under Section 21D of the Exchange Act, 15 U.S.C., § 78u-4(f), which governs any right of contribution asserted pursuant to the Exchange Act.

74.     As a result, Defendants Kennedy, Auerbach, Dopp, Greenwood, and St. Clare damaged Tilray and are liable to the Company for contribution.

75.     Plaintiffs, on behalf of Tilray, have no adequate remedy at law.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.      Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.      Directing Tilray to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to Tilray restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on issues so triable.

Dated: June 16, 2020

**GAINEY McKENNA & EGLESTON**

By: */s/ Thomas J. McKenna*
    Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiffs***

## **VERIFICATION**

I, CHAD GELLNER, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Tilray, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _16_ day of June 2020.

_____
CHAD GELLNER

## **VERIFICATION**

I, MATTHEW RUFO, have reviewed the allegations made in this Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of Tilray, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _15_ day of June 2020.

MATTHEW RUFO